**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**CARA CAMILLE YOUNG,**

                  Plaintiff,

**v.**

           **CIVIL ACTION NO.: 2:16-CV-112
(BAILEY)**

**NANCY A. BERRYHILL,
Acting Commissioner of Social Security,**

             Defendant.

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

This case arises from the denial of Plaintiff Cara Camille Young's ("Plaintiff") Title II application for a period of disability and disability insurance benefits ("DIB"). After Plaintiff's application proceeded through the administrative process, a United States Administrative Law Judge ("ALJ"), Karen B. Kostol, concluded that Plaintiff was not disabled within the meaning of the Social Security Act. Plaintiff's request for review by Appeals Counsel was denied, making the ALJ's decision the final decision of Defendant Nancy A. Berryhill ("Commissioner"), the acting Commissioner of Social Security. Now, Plaintiff seeks judicial review of the Commissioner's decision. Because the Commissioner's final decision to deny Plaintiff's claim for DIB is supported by substantial evidence, the undersigned reports and recommends that Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary Judgment be granted.

## II.  <u>PROCEDURAL HISTORY</u>

On or about October 22, 2013, Plaintiff filed a claim for disability and DIB, alleging that her disability began on January 1, 2013. R. 19, 160. Plaintiff's claim was initially denied on February 20, 2014, and, upon reconsideration, denied again on March 24, 2014. R. 98, 107. After these denials, Plaintiff filed a written request for a hearing. R. 19, 114. On October 22, 2015, a hearing was held before an ALJ in Morgantown, West Virginia. R. 19, 32, 38, 125. Plaintiff, represented by Brian D. Bailey, Esq., appeared and testified along with Larry A. Bell, an impartial vocational expert. R. 19, 38, 148, 151, 255. Less than a month later, the ALJ issued a decision concluding that Plaintiff was not disabled within the meaning of the Social Security Act. R. 16. On November 29, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. 1.

On December 28, 2016, Plaintiff, through counsel, filed a Complaint in this Court to obtain judicial review of the Commissioner's final decision pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). Compl., ECF No. 1. The Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed her Answer and the Administrative Record of the proceedings on March 6, 2017. Answer, ECF No. 6; Admin. R., ECF No. 7. Soon thereafter, Plaintiff and the Commissioner filed their Motions for Summary Judgment and their supporting briefs on March 30, 2017 and April 5, 2017, respectively. Pl.'s Mot. Summ. J., ECF No. 10; Def.'s Mot. Summ. J., ECF No. 14. Plaintiff filed a Response on April 11, 2017. Pl.'s Resp., ECF No. 16. On August 9, 2017, the Court heard oral argument on the parties' cross motions for summary judgment.

The matter is now before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule of Civil Procedure 9.02(a). Having reviewed the parties' motions and the administrative record, and having heard oral argument, the undersigned now issues the following Report and Recommendation.

### III.   <u>BACKGROUND</u>

**A.   Personal History**

Plaintiff was born on September 28, 1959, and was fifty-four years old at the time she filed her claim for DIB. <u>See</u> R. 71. She is 5'5'' tall and weighs approximately 240 pounds. R. 200. She lives in a house with her husband and children. R. 45, 215. She completed school through the twelfth grade but has not received any specialized, trade or vocational training. R. 201. Before and after filing her claim for DIB, Plaintiff worked as a dishwasher and short order cook at Kay's Diner. R. 60, 191. Plaintiff claims that she is unable to work due to a (1) left bundle branch block and (2) heart condition. R. 200.

**B.   Medical History**

**1.  Medical History Pre-Dating Alleged Onset Date of January 1, 2013**

Generally, from January 2009 to October 2012, Plaintiff visited John A. Mathias, M.D., at St. Joseph's Hospital in Buckhannon, West Virginia on a variety of occasions. <u>See</u> R. 316–32. On several of those occasions, Plaintiff complained of leg pain, R. 320, wrist pain, R. 321, chest and shoulder pain, R. 325, arm pain, R. 326, and numbness, R. 327.

On October 15, 2009, C. David Burtner, M.D., of St Joseph's Hospital, obtained PA and lateral chest films of Plaintiff based on her complaints of chest pain, discomfort and pressure. R. 281. Dr. Burtner concluded that the PA and lateral chest films were normal. R. 281.

After complaining of numbness, Dr. Mathias referred Plaintiff to Frederick J. Gabriele, M.D., of St. Joseph's Hospital. R. 278. On March 23, 2010, Dr. Gabriele saw Plaintiff for a CT scan. R. 278. Dr. Gabriele concluded that the CT scan of Plaintiff's head was negative. R. 278.  Dr. Mathias also referred Plaintiff to Ali A. Khan, M.D., of St. Joseph's Hospital, for a carotid doppler study, which was performed the next day. R. 315. Based on the study, Dr. Khan concluded that there was "40-59% stenosis of the right and less than 50% stenosis of the left [internal carotid artery]." R. 315.

Approximately one month later, David Libell, M.D., of the West Virginia University Department of Neurology, wrote a letter to Dr. Mathias regarding his evaluation of Plaintiff's symptoms. R. 344. There, Dr. Libell noted that he did not see any abnormalities in the CT scan of Plaintiff's head which was normal. R. 344. Next, he noted that Plaintiff reported an improvement in her headaches after Dr. Mathias instructed her to take aspirin instead of estrogen. R. 344. Despite that improvement, Plaintiff nevertheless reported having daily headaches, many of which were related to her son. R. 344. Finally, Dr. Libell recommended that she get a CT angiography ("CTA") of her head and neck, an EEG and, in the meantime, prescribed Plaintiff amitriptyline for her headaches. R. 345.

On July 7, 2010, Dr. Libell, again, wrote a letter to Dr. Mathias regarding his most recent visit with Plaintiff. First, Dr. Libell notes that "[h]er EEG and CTA were normal." R.

343. Second, he notes that when he discussed the test results with Plaintiff in May 2010, she reported that she had not had any bad headaches since she started taking amitriptyline. R. 343. But, on July 7, Plaintiff reported that she is still having headaches, approximately twice a week. R. 343. Dr. Libell recommended that they increase her prescription temporarily. R. 343.

Later that year, Plaintiff saw Susan E. Long, M.D., of St. Joseph's Hospital, for a colonoscopy screening. R. 312–13. During her screening, Plaintiff reported a history of mini strokes. R. 312. Because of that report, Dr. Long conferred with Dr. Mathias about the findings of Dr. Bell, a neurologist who had previously examined Plaintiff. R. 314. Because Plaintiff's EEG, CTA and other studies all came back normal, Dr. Long and Dr. Mathias agreed "that this patient has not experienced transient ischemic attacks or mini-strokes" and, therefore, Dr. Long could proceed with the colonoscopy. R. 314.

On December 17, 2010, Dr. Mathias referred Plaintiff to Abdulmalek Sabbagh, M.D. R. 365. Five days later, Dr. Sabbagh wrote a letter to Dr. Mathias regarding his evaluation of Plaintiff. R. 342. Dr. Sabbagh reported that Plaintiff's EKG was normal and her "echocardiogram showed normal left ventricular systolic function with ejection fraction 55-60%." R. 342. Dr. Sabbagh also noted that Plaintiff would be scheduled for a cardiac stress test as soon as possible. R. 342.

On December 30, 2010, Plaintiff went to the emergency room at Stonewall Jackson Memorial Hospital. R. 264–68. There, Plaintiff underwent diagnostic imaging that showed "[n]ormal left ventricular systolic function" with a "[n]ormal ejection fraction of 69%." R. 268. That said, the attending physician could not "rule out apical ischemia versus previous myocardial infarction." R. 268.

5

In March of the following year, Dr. Mathias referred Plaintiff to Nitesh Ratnakar, M.D., of WV Gastroenterology & Endoscopy, for his opinions on Plaintiff's severe gastroesophageal reflex disease. R. 341. On March 21, 2011, Dr. Ratnaker authored a report and noted that Plaintiff denied having any headaches, trouble breathing and joint pain. R. 337.

Based on Plaintiff's complaints of numbness and numbness in her shoulders, Sara Chua, M.D., of St. Joseph's Hospital, directed Plaintiff to see Dr. Gabriele on January 19, 2012. R. 276. During her exam, Dr. Gabriele obtained PA and lateral chest films that he concluded were normal. R. 276.

On February 1, 2012, Plaintiff saw M. Mujib Rahman, M.D., of Davis Memorial Hospital, for a nerve conduction study and EMG. R. 355–57. At the time of her visit, Plaintiff did not report having trouble with headaches. R. 355. Plaintiff did, however, complain of pain in her left leg, hip and arm, including numbness and tingling sensations. R. 355. During her examination, Dr. Rahman observed the strength of Plaintiff's upper and lower extremities as bilateral and symmetrical. R. 356. Her sensory exam was unremarkable. R. 356. Also, her gait and coordination were normal but "she walks with a limping gait secondary to left hip pain." R. 356. A week later, Dr. Rahman dictated his report on the results of Plaintiff's nerve conduction study and EMG. R. 350–54. Although Plaintiff complained of left knee swelling, left hip pain and arthritis, Dr. Rahman concluded that his evaluation of Plaintiff was normal and that there was "no significant electrodiagnostic evidence of carpel tunnel syndrome or ulnar neuropathy or mononeurapathy multiplex or polyneuropathy or cervical radiculopathy." R. 351.

On August 13, 2012, Plaintiff saw Dr. Chua and complained of "swelling, pain, weakness, and loss of function of her left hand." R. 306. Plaintiff said she had limited range of motion that prevented her from doing dishes at work. R. 306. Although Dr. Chua noted Plaintiff's muscle strength in her left hand, wrist, and arm was 3/5, Plaintiff's exam was otherwise unremarkable. R. 307–08. That same day, on the direction of Dr. Chua, Plaintiff went to see Dr. Gabriele for an x-ray. R. 275. After reviewing Plaintiff's hand films, Dr. Gabriele concluded that they were normal. R. 275.

Soon thereafter, on August 20, 2012, Plaintiff saw James J. Kim, M.D., of St. Joseph's Hospital. R. 305. There, Plaintiff complained of pain and swelling in her left hand. R. 305. Dr. Kim noted that the exam was unremarkable and the range of motion of Plaintiff's hand and fingers was not limited and within normal limits. R. 305. Ultimately, Dr. Kim concluded that Plaintiff left wrist was sprained and advised her to use a cock-up splint. R. 305. That same day, Plaintiff also saw Yaser Kalash, M.D., of St. Joseph's Hospital, for a carotid doppler study. R. 311. Although Dr. Kalash noted that the gray-scale imaging showed mild intimal thickening of the left and right carotid arteries, the study ultimately showed "[n]o hemodynamically significant stenosis." R. 311.

In addition, Plaintiff saw Dr. Rahman of St. Joseph's Hospital on a regularly basis throughout 2012. R. 376–87. During those visits, her complaints of pain were generally consistent, often complaining of leg pain and migraines. Id. However, on December 12, 2012, Plaintiff complained of swelling in both of her knees, knees giving out, and trouble walking stairs, but she did not complain of migraines or headaches. R. 376.

**2.  Medical History Post-Dating Alleged Onset Date of January 1, 2013**

On March 1, 2013, Plaintiff visited Dr. Chua because Plaintiff had been feeling

light headed. R. 301. During her examination, Plaintiff complained of experiencing

vertigo, left arm numbness and fatigue over the preceding three weeks. R. 301. In one

instance, Plaintiff reported feeling acutely tired with heavy arms while she was walking

through Walmart. R. 301. In addition, Plaintiff reported feeling lightheaded and seeing

black when she bends over and stands up quickly. R. 301. Although Plaintiff continued

to smoke, she said that her asthma was good and under control. R. 301. Lastly, Plaintiff

complained of chest and left arm pain with dyspnea at times. R. 301.  She said it occurs

when she strains herself. R. 301. Plaintiff's examination was otherwise insignificant. R.

302–03. Dr. Chua opened a task for stress test to investigate her chest pain. R. 304.

Plaintiff underwent a lexiscan stress test and a lexiscan caridolite stress test on

March 7, 2013. R. 298–300. There, Plaintiff reported chest pain and a history of left

bundle branch block to Dr. Kalash of St. Joseph's Hospital, who conducted the stress

test. R. 298–99. Dr. Kalash further concluded that "[t]here is no scintigraphic evidence

of transient myocardial ischemia." R. 298. In other words, the gated cardiac function

study was normal and "[t]he left ventricular ejection fraction [wa]s 72%." R. 298. In

addition, after the lexiscan stress test, Dr. Kalash concluded that although the "[p]retest

electrocardiogram showed sinus rhythm at 68 beats per minute with left bundle branch

block," the test itself was negative "for myocardial ischemia by electrocardiogram

criteria" and that nuclear report imaging would follow. R. 299.

The next day, Plaintiff saw Dr. Chua for Plaintiff's one week follow-up

appointment. R. 293–97. During her visit, Plaintiff complained of headaches, dizziness

and asthma. R. 293. She said that her headaches improved with medication in the past, but she could not remember which medicine. R. 293. Plaintiff reported no weakness or numbness, her asthmas was under control, but her headaches were located on the left side of her head when she gets them. R. 293. Dr. Chua concluded that Plaintiff suffers from dizziness and giddiness (though improved), chest pain, hypertension and asthma. R. 296. Plaintiff's exam was otherwise unremarkable. R. 294–95. Moving forward, Plaintiff was directed to find out what medicine she had been prescribed in the past for her headaches, take a sample medicine for asthma and take her hypertension prescription, as previously instructed. R. 296. Also, regarding Plaintiff's chest pain, Dr. Chua noted that she reviewed the results of Plaintiff's stress test, which were negative. R. 296.

On March 20, 2013, Plaintiff saw Dr. Rahman of Davis Memorial Hospital and noted that she had seen Dr. Chua the week before after experiencing a bad headache. R 374. In addition, Plaintiff complained of occasional knee swelling and her left leg giving out. R. 374. Recently, she reported having trouble going up and down stairs. R. 374.

Less than a month later, Plaintiff saw Dr. Chua for a follow-up visit. R. 289–92. There, Plaintiff reported that her asthma was okay, her headaches were improved but still occured despite medications and her ears hurt. R. 289. Plaintiff's exam was otherwise unremarkable. R. 290–91. Moving forward, Dr. Chua advised Plaintiff that she needs to quit smoking to improve her asthma, she would increase Plaintiff's prescription to aid her headaches and to see how her ear pain progresses before her next visit. R. 292. In addition, Dr. Chua opened a task for a head MRI for Plaintiff's headaches. R.

292. The MRI of Plaintiff's brain was performed on April 11, 2013 at Davis Memorial Hospital. R. 389. Although the MRI showed white matter changes, the results were otherwise unremarkable. R. 389.

After the MRI, Plaintiff saw Dr. Chua for a follow-up visit a week later. R. 285–88. During her visit, Plaintiff complained of struggling with her gastroesophageal reflux disease, which was causing her, at times, to spit up food. R. 285. That said, Plaintiff also reported "feeling much better" because her headaches had improved while taking Eleavil and that she has not had any recent problems with her asthma. R. 285. Although Plaintiff's exam was otherwise unremarkable, Dr. Chua noted that she would refer Plaintiff to a neurologist because of her headaches and white matter changes. R. 286–88.

On May 10, 2013, Plaintiff visited Dr. Rahman and reported that her headaches were doing somewhat better; the last one was a month before her visit. R. 372. But Plaintiff also reported getting dizzy when she bends over. R. 372. Two months later, Plaintiff complained to Dr. Chua about bad pain in her heel. R. 282–84. Dr. Chua noted that Plaintiff's medical status was otherwise unchanged. R. 283. On that same day, Dr. Chua directed Plaintiff to see Mark A. Hackney, M.D., at St. Joseph's Hospital. R. 272. Based on his review of Plaintiff's heel, Dr. Hackney concluded that there were "[s]ubtle calcaneal spurs," but the exam was otherwise unremarkable. R. 272. On August 12, 2013, Plaintiff saw Dr. Rahman and reported that she was doing well and that the medication was controlling her headaches. R. 370. Plaintiff, however, reported that she was recently having issues with dizziness. R. 370.

10

On December 30, 2013, Morgan D. Morgan, M.A., of Morgan Psychological Services authored a report on her mental status examination and clinical interview of Plaintiff for the West Virginia Disability Determination Service. R. 395–98. There, Ms. Morgan concluded that Plaintiff suffered from moderately deficient recent recall and concentration and mildly deficient remote recall. R. 397–98. Based on those deficiencies and other observations, Ms. Morgan concluded that Plaintiff suffers from adjustment disorder, with mixed anxiety and depressed mood. R. 397.

On January 22, 2014, Arturo Sabio, M.D., of Tri-State Occupational Medicine, Inc., conducted a physical examination of Plaintiff for the West Virginia Disability Determination Service. R. 400–05. Although Plaintiff complained of chest pain and hypertension during her examination, Dr. Sabio noted that Plaintiff did not have a heart attack or a stroke. R. 400–01. Plaintiff also complained of shortness of breath, chronic cough and wheezing, but she denied experiencing dizziness. R. 401. During the exam, Dr. Sabio observed that Plaintiff ambulates with normal gait and without aid; her heart rate is regular and respirations unlabored; and her motor strength is 5/5 in her upper and lower extremities. R. 401–03. Based on his observations, Dr. Sabio concluded that Plaintiff suffers from controlled hypertension, chronic bronchitis secondary to tobacco use, chronic obstructive pulmonary disease, osteoarthritis worsened by her excessive weight and history of occasional headaches. R. 403–04.

In 2014, Dr. Chua regularly saw Plaintiff and consistently recommended that Plaintiff quit smoking and consider lifestyle changes, including diet and exercise. R. 495, 499, 503. Later, Dr. Chua referred Plaintiff to Country Roads Physical Therapy where she was evaluated on April 15, 2014. R. 416–19. During her evaluation, Plaintiff

11

complained of left knee, hip and arm pain that made it difficult to sit and stand for long periods of time and, at times, prevented her from using the stairs and forced her to use a cane. R. 416. Two days later, Plaintiff returned to physical therapy and reported doing "a little better." R. 420. The following week, Plaintiff reported that she is "doing good" and that her numbness has improved though she still was experiencing stiffness in her left leg and pain when she sits too long. R. 423. Plaintiff later told Dr. Chua that she was doing okay and had no complaints. R. 493.

In April 2014, Plaintiff also saw Adnan Alghadban, M.D., of Associated Specialists Inc., for an EMG nerve conduction study. R. 527–29. During the study, Plaintiff complained of neck and back pain with pain and numbness in her upper and lower extremities. R. 527. Dr. Alghadban, however, noted that Plaintiff's cranial nerves were normal, motor strength in four extremities was 5/5, symmetrical and normal reflexes, normal gait and coordination and clear chest. R. 527. Although Dr. Alghadban concluded that the "EMG nerve conduction study was negative," he prescribed Plaintiff medication, recommended physical therapy and noted that injections may be beneficial. R. 527. Generally, Dr. Alghadban's observations were the same for each of Plaintiff's follow-up appointments, see R. 527–48, though on one occasion Plaintiff's sensory exam showed decreased pinprick and absent reflexes in her ankles. R. 531. In addition, Dr. Alghadban started Plaintiff on continuous positive air pressure therapy ("CPAP") to address her obstructive sleep apnea. R. 533, 534, 536. While using CPAP, Plaintiff was noncompliant at the thirty, sixty, and ninety day marks. R. 538–46. Plaintiff discontinued CPAP later that year.[1] R. 547.

---

[1] A sleep study performed in June 2015 showed that Plaintiff's obstructive sleep apnea was successfully treated with nasal CPAP. R. 554.

Three months later, Plaintiff was diagnosed with mild degenerative joint disease of her left hip by Mark A. Hackney, M.D., of United Hospital Center. R. 558. That same day, Thomas C. Koay, M.D., of the same, concluded that there were no significantly abnormalities in Plaintiff's left and right knees. R. 559–60.

In August 2014, Dr. Chua again referred Plaintiff to physical therapy where she reported burning pain in her left arm and difficulty raising it up. R. 455, 486–90. Plaintiff regularly went to physical therapy for her left shoulder through the remainder of August and into the first week of September. R. 455–69. During those visits, Plaintiff consistently reported improvements in her left shoulder. R. 458 ("Patient stated her [shoulder] is feeling better."); R. 460 ("Pt states that her L shoulder is 'doing good' and she has improved [range of motion] and no pain."); R. 462 ("Patient stated her [shoulder] is doing better . . . ."); R. 464 ("My shoulder is real good. I was hoping today could be my last day."); R. 466 ("[Patient] has no functional limitation at this time per her report.").

On August 9, 2014, Plaintiff visited Davis Medical Center for x-ray imaging of her chest and a CT scan of her head and left shoulder. R. 443–45. The x-ray imaging showed that Plaintiff's heart size was within normal limits and her lungs were clear. R. 443. Based on the imaging, the attending physician concluded that there was "no evidence of pulmonary edema or pneumothorax." R. 443. The CT scan of Plaintiff's head showed "no evidence for intracranial mass-effect or hematoms." R. 444. Instead, the imaging showed that her ventricular system was within normal limits, paranasal sinuses clear and there was no fracture. R. 444. Further, the CT scan of Plaintiff's left

shoulder showed "no acute abnormality," though it did show "[c]alcific tendinosis of the rotator cuff." R. 445.

On October 1, 2014, Plaintiff saw Dr. Chua for a three month follow-up appointment. R. 483–85. There, Plaintiff only reported having trouble sleeping through the night. R. 483. A few months later, in January 2015, Plaintiff saw Dr. Chua and reported that her left shoulder still hurts despite physical therapy. R. 479. In addition, Plaintiff reported dizziness when she stands up. R. 479. On February 3, 2015, Plaintiff received a cortisone injection in her left shoulder. R. 523–26. Two days later, Plaintiff saw Dr. Chua for a follow-up visit and reported that the cortisone injection that she received in her left shoulder "really helped." R. 472.

Approximately one month later, Plaintiff saw Heather N. Reesman, P.A., of Tygart Valley Orthopedics & Sports Medicine for a follow-up visit. R. 519–22. During her visit, Plaintiff reported, inter alia, "no muscle aches, no muscle weakness, no arthralgias/joint pain, no back pain, and no swelling in the extremities." R. 521. In addition, Plaintiff reported "no numbness, no seizures, no dizziness, and no headaches." R. 521. She also reported "no depression, no sleep disturbances" and "no fatigue." R. 521. Further, Plaintiff reported that the cortisone injection improved her shoulder pain, though she still experiences some discomfort when her arm is above her head. R. 521. Finally, Ms. Reesman observed that Plaintiff had "5/5 supraspinatus strength testing with pain" and "5/5 internal and external rotation as well." R. 521. Finally, Ms. Reesman observed that Plaintiff had "5/5 supraspinatus strength testing with pain" and "5/5 internal and external rotation as well." R. 521.

14

Three months later, in May 2015, Plaintiff received another cortisone injection after complaints of decreased range of motion and numbness in her left arm. R. 579–82. Plaintiff returned for a follow-up appointment in June 2015. R. 583–85. During her follow-up, Plaintiff reported that she was "pain free." R. 585. Linda Little, the physician's assistant who performed and documented Plaintiff's visit, noted that Plaintiff's "[l]eft shoulder calcific tendonitis with questionable carpel tunnel symptoms" was "totally resolved." R. 585. Because Plaintiff was pain free and had good range of motion, she wished to follow-up on an as needed basis. R. 585. Ms. Little advised Plaintiff that she could have "cortisone injections every four months as needed." R. 585.

Finally, during June and July 2015, Plaintiff saw Dr. Alghadban three times regarding her obstructive sleep apnea. R. 586–89. During each visit, Dr. Alghadban's physical examination was consistent and unremarkable, other than observing a vitamin D deficiency on one occasion. R. 588.

### 3. Medical Reports/Opinions

#### a. Disability Determination Explanation by Dominic Gaziano, M.D., February 12, 2014

On February 12, 2014, Dominic Graziano, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level ("Initial Explanation"). R. 71–83. In the Initial Explanation, Dr. Graziano concluded that Plaintiff suffers from the following severe impairments: Obesity and hypertensive vascular disease. R. 76. Additionally, Dr. Graziano concluded that Plaintiff suffers from the following non-severe impairments: Affective disorders and anxiety disorders. R. 76.

In the Initial Explanation, Dr. Graziano completed a physical residual functional capacity ("RFC") assessment of Plaintiff. R. 77–79. During this assessment, Dr.

Graziano found that while Plaintiff does not possess manipulative, visual or communicative limitations, Plaintiff does possess exertional, postural and environmental limitations. R. 78–79. Regarding Plaintiff's exertional limitations, Dr. Graziano found that Plaintiff is able to: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. R. 78. Regarding Plaintiff's postural limitations, Dr. Graziano found that Plaintiff may: (1) frequently climb ramps/stairs, (2) occasionally climb ladders/ropes/scaffolds, (3) occasionally balance and (4) frequently stoop, kneel, crouch and crawl. R. 78. Finally, regarding Plaintiff's environmental limitations, Dr. Graziano found that, while Plaintiff need not avoid wetness, humidity and vibrations, she should avoid concentrated exposure to extreme cold, heat, noise, "[f]umes, odors, dusts, gases, poor ventilation, etc." and hazardous machinery and heights. R. 79. After completing the RFC assessment, Dr. Graziano determined that Plaintiff is able to perform medium-exertional work with the above limitations. R. 82.

Also in the Initial Explanation, Chester Frethiem, Psy.D., a state agency psychologist, completed a Psychiatric Review Technique form. R. 76–77. On this form, Dr. Frethiem analyzed the degree of Plaintiff's functional limitations. R. 76–77. Specifically, Dr. Frethiem rated Plaintiff's restriction in her difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace as "moderate." R. 76. Additionally, Dr. Frethiem rated Plaintiff's restriction of activities of daily living and episodes of decompensation as "none." R. 76.

### b. Disability Determination Explanation by Narendra Parikshak, M.D., March 20, 2014

On March 20, 2014, Narendra Parishak, M.D., a state agency medical

consultant, prepared the Disability Determination Explanation at the Reconsideration

level ("Reconsideration Explanation"). R. 85–96. In the Reconsideration Explanation, Dr.

Parishak largely agreed with all of Dr. Gaziano's conclusions from the Initial

Explanation. <u>Compare</u> R. 71–83 <u>with</u> R. 85–96. However, Dr. Parikshak concluded that

the severity of Plaintiff's affective and anxiety disorders were severe rather than non-

severe. R. 89. Also in the Reconsideration Explanation, Joseph Richard, a state agency

psychologist, reviewed Dr. Frethiem's Psychiatric Review Technique form from the

Initial Explanation. R. 89–90. Dr. Richard agreed with and affirmed all of Dr. Frethiem's

conclusions. <u>Compare</u> R. 76–77 <u>with</u> R. 89–90.

## C.   Testimonial Evidence

During the administrative hearing on October 22, 2015, Plaintiff testified

regarding her work history. Plaintiff has not worked fulltime since 1996. R. 48. Since

2005, Plaintiff worked part-time as a short-order cook and dishwasher at Kay's Diner. R.

47, 49–50. On average, Plaintiff worked approximately eight hours a week, usually over

a two-day period. R. 48. At times, however, Plaintiff reported working as much as four

days a week. R. 49. Working as short-order cook and dishwasher required Plaintiff to be

on her feet most of the day and to lift plates that did not exceed ten pounds. R. 50. After

filing for disability insurance, Plaintiff quit working for Kay's Diner because she just

couldn't do it anymore. R. 47, 55, 68.

Plaintiff also testified that she suffers from multiple physical ailments and the

physical limitations associated with those ailments. Specifically, Plaintiff testified that her

17

left hip, leg and arm swell. R. 51. The swelling in her arm and leg is generally caused by bending down and doing heavy lifting, which also makes her lightheaded. R. 52. When this occurs, Plaintiff is forced to sit down for fifteen to twenty minutes to get her "bearings back." R. 52. In addition, Plaintiff suffers from a left branch bundle that also makes her lightheaded. R. 52. If required to stand-up and walk around for two hours a day, Plaintiff claims that her leg and hip start swelling and she starts getting lightheaded with any movement. R. 53. Similarly, Plaintiff claims that her arm will swell and hurt so bad that she cannot use it. R. 53. Because of the pain, Plaintiff cannot hold her arm out or lift it over her head. R. 53.

Finally, Plaintiff briefly testified regarding her daily living activities. In general, Plaintiff claimed that she mostly sits around all day. R. 56. Also, Plaintiff claimed that she does not go anywhere, even though she is able to drive without limitation. R. 45.

### D.   Vocational Evidence

#### 1.  Vocational Testimony

Larry Bell, an impartial vocational expert, also testified during the administrative hearing. R. 59–68. Initially, Mr. Bell testified regarding Plaintiff's most recent work as a short-order cook and dishwasher at Kay's Diner. R. 60–61. Although working strictly as just a short-order cook would be characterized as light and semi-skilled and working strictly as a dishwasher would be medium and unskilled, Mr. Bell characterized Plaintiff's combined work as light and unskilled. R. 60–61.

After addressing Plaintiff's past relevant work, the ALJ presented Mr. Bell with several hypothetical questions for his consideration. First, the ALJ asked if "an individual

with the same age, education, and the past work experience" as Plaintiff who is capable

of medium level work, can perform Plaintiff's work with the following limitations:

> Can occasionally climb ladders, ropes, or scaffolds, can
> occasionally balance, can frequently climb ramps, or stairs,
> stoop, crouch, kneel, and occasionally crawl. . . . [M]ust
> avoid concentrated exposure to extreme cold, extreme heat,
> excessive noise, irritants such as fumes, odors, dusts, and
> gases, and concentrated exposure to any hazards, such as
> dangerous moving machinery and unprotected heights.

R. 61. Mr. Bell answered in the affirmative. Next, the ALJ asked if Plaintiff's past work

would remain available if there was an added limitation that the "individual is limited to

no more than occasional overhead reaching with the left upper extremity . . . ." R. 61.

Mr. Bell again answered in the affirmative. R. 62. Second, the ALJ asked if the past

relevant work would remain available if there was an additional "limitation that said

individual is capable of no more than occasional reaching out to the side or to the back

with an upper extremity . . . ." R. 62. Again, Mr. Bell answered in the affirmative.

Third, the ALJ asked if there is other work available at the medium exertional

level despite the previously given limitations. R. 62. Mr. Bell testified that there are: "At

the medium level[,] that individual could work as a food service worker in a hospital

setting. . . . Or as a laundry worker . . . ." R. 62. Fourth, the ALJ asked if the past work

would remain available if there was an added "limitation that said individual can never

climb ladders, ropes, or scaffolds and must avoid all exposure to any hazards . . . ." R.

62. Mr. Bell answered in the affirmative. R. 62. Mr. Bell also testified that both jobs at

the medium exertional level would remain available with said limitations. R. 63. Then,

the ALJ asked if the past work would remain available if there was an additional

"limitation that said individual is capable of occasional changes in the work setting and

no strict production quotas and is capable of no more than occasional interaction with

the general public, coworker, and supervisors . . . ." R. 63. After clarifying that Plaintiff

did not take orders directly from customers when she worked as a short-order cook, Mr.

Bell confirmed that the previous work would remain available. R. 63.

Next, the ALJ asked if there is other work available at the light exertional level. R.

64. Mr. Bell said that the individual could work as a cleaner or laundry folder. R. 64. At

the sedentary exertional level, Mr. Bell testified that the individual could work as a

security monitor or a sorter. R. 64. Here, the ALJ posed several related hypotheticals.

Could an individual perform the sedentary, light and medium exertional jobs if he or she

"were limited to simple, routine, and repetitive tasks"? R. 65. Mr. Bell confirmed that the

jobs at each level would remain available, but Plaintiff's past relevant work would not. R.

65. Finally, the ALJ asked how much time off task an employer would tolerate and

whether jobs were available if an individual was off task twenty percent of the time or

more. R. 65. Mr. Bell said that employers generally tolerate an employee who is off task

six percent of the time, at most, and being off task for twenty percent or more "would

completely eliminate a competitive work routine at any level . . . ." R. 65.

Plaintiff's counsel, Mr. Bailey, also presented questions for Mr. Bell's

consideration during the administrative hearing. R. 66–67. First, Mr. Bailey asked if

Plaintiff's work as a short-order cook and dishwasher was a composite job. R. 66. Mr.

Bell answered in the affirmative. R. 66. Second, Mr. Bailey asked if a grill was a

workplace hazard. R. 66. Mr. Bell initially said that it was not. R. 66. But, after additional

testimony, Mr. Bell agreed that a grill has the potential to be hazardous, for example, if

someone put their hands on it. R. 66–67.

After Mr. Bailey's questioning, the ALJ posed Mr. Bell with one more hypothetical: Would the sedentary, light and medium exertional jobs and Plaintiff's past relevant work be available "if you add a limitation that [said] individual must be afforded the opportunity for brief one to two minutes changes in position at intervals not to exceed 30 minutes without being off task"? R. 68. In response, Mr. Bell testified that the sedentary and light jobs would remain available but the medium and past relevant work would not. R. 68.

### 2. Disability Reports & Work History Reports

On an undated Disability Report, Plaintiff declared that she suffers from multiple impairments that limit her ability to work. R. 200. Specifically, Plaintiff declared that the following impairments limit her ability to work: (1) left branch bundle (2) heart condition. R. 200. Although Plaintiff claimed that her conditions first started bothering her on January 1, 2013, she reported that her conditions have not caused her to change her work activity. R. 200. In fact, at the time she completed the disability report, Plaintiff reported that she was still working. R. 200. Next, Plaintiff stated that she received medical treatment for her physical conditions, but not for any of her mental conditions. R. 203. The medicine Plaintiff was receiving at the time for her physical conditions was (1) Amitriptyline (heart condition), (2) Aspirin (blood thinner), (3) Atenonol (blood pressure), (4) Gabapentin (heart/headaches), (5) klor-con m10 (fluid pill), (6) Proair (breathing) and (7) Retadine (acid pill). R. 203.

On an undated, sparsely completed Work History Report submitted by Plaintiff, Plaintiff indicated that she worked two jobs over the last fifteen years before she became unable to work. R. 191–93. Specifically, Plaintiff reported that she has worked

as a sewing worker in a factory from 1978 to 1996 and has most recently worked as a dishwasher/cook at a diner since 2005. R. 191. When describing the latter position, Plaintiff stated that she worked four-hour shifts three days a week. R. 192.

**E.   Lifestyle Evidence**

    **1.   Adult Function Report**

On an undated function report, Plaintiff declared that she is unable to work because (1) it tires her out, (2) it makes her arms swell, (3) her "side goes num[b]" and (4) she has mini strokes. R. 215.

Despite those limitations, Plaintiff described her daily activities. Plaintiff reported that she does house work, goes up and down stairs to do laundry and cooks and cleans. R. 216. Plaintiff is able to care for her husband and son, supply her pets with food and water (sometimes with the assistance of her husband) and she has no problem taking care of her personal hygiene. R. 216. Further, Plaintiff reported that she gets outside "all the time" and shops for groceries. R. 218. In her spare time, Plaintiff talks to others in person and over the phone. R. 219. Also, Plaintiff reported that her hobbies and social activities have not been affected by her physical conditions. R. 219–20.

Thereafter, Plaintiff described how her impairments impact her ability to do certain physical activities. For example, Plaintiff states that she cannot lift things for very long. R. 220. She cannot bend or get back up. R. 220. She cannot walk very far without being tired. R. 220. She cannot kneel for very long or she cannot get back up. R. 220. Finally, she cannot climb stairs very well; climbing stairs to do laundry tires her out. R.

220. That said, Plaintiff reported that she does not use crutches, cane, walker, wheelchair or the like. R. 221.

### 2. Personal Pain Questionnaire

On an undated personal pain questionnaire, Plaintiff reported experiencing chest pain, bad headaches and numb left arm. R. 223–26. In each instance, Plaintiff characterized the pain as burning and stinging which comes and goes. R. 223–26. Generally, the pain lasts about half an hour and gets worse if she worries or if she works too hard and too long. R. 223–26. To make the pain go away, Plaintiff says she takes it easy for a while. R. 223–26.

## IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical

or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520, 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520 (2000), ALJ Kostol made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2018.

2.      The claimant has not engaged in substantial gainful activity since January 1, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).

. . .

3.      The claimant has the following severe impairments: osteoarthritis of the left knee and hip; mild degenerative joint disease of the left hip; tendinitis of the left rotator cuff; headaches; mild pulmonary restrictive disease; obesity; hypertensive cardiovascular disease; and obstructive sleep apnea (20 CFR 404.1520(c)).

. . .

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

. . .

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) (i.e. is able to occasionally list and/or carry 50 pounds; frequently lift and/or carry 25 pounds; and stand and/or walk, with normal breaks, for a total of about 6 hours in an 8-hour workday), except the claimant can never climb ladders, ropes or scaffolds; can only occasionally balance and crawl; can frequently climb ramps or stairs, stoop, crouch, and kneel; must avoid concentrated exposure to extreme cold, extreme heat, excessive noise, and irritants (such as fumes, odors, dust, and gases), must avoid all exposure to hazards (such as unprotected heights and dangerous moving machinery); can only occasionally reach overhead, laterally, and behind with the left upper extremity; is limited to simple, routine, and repetitive tasks in a low stress job, defined as having only occasional changes in the work setting, and no strict production quotas, and is limited to occasional interaction with the general public, co-workers, and supervisors.

. . .

6.      The claimant has no past relevant work (20 CFR
        404.1565).

. . .

7.      The claimant was born on September 28, 1959 and
        was 53 years old, which is defined as an individual
        closely approaching advanced age, on the alleged
        disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and
        is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not an issue because the
        claimant does not have past relevant work (20 CFR
        404.1568).

10.     Considering the claimant's age, education, work
        experience, and [RFC], there are jobs that exist in
        significant numbers in the national economy that the
        claimant can perform (20 CFR 404.1569,
        404.1569(a)).

. . .

11.     The claimant has not been under a disability, as
        defined in the Social Security Act, from January 1,
        2013, through the date of this decision (20 CFR
        404.1520(g)).

R. 21–31.

## VI.    DISCUSSION

**A.    Contentions of the Parties**

In her Motion for Summary Judgment, Plaintiff contends that the ALJ's decision is

not supported by substantial evidence. ECF No. 10 at 1. Specifically, Plaintiff submits

that the ALJ: (1) "misstated and misapplied the law" when she assessed Plaintiff's

credibility, (2) failed to account for Plaintiff's concentration impairments when assessing

Plaintiff's RFC and (3) failed to meet her burden of proving that "other work" exists that

Plaintiff is capable of performing. Pl.'s Br. Supp. Mot. Summ. J. 1, ECF No. 11. Based on the alleged errors, Plaintiff requests that the Court remand her case for further proceedings. Id. at 15.

Conversely, the Commissioner argues that the ALJ's decision is supported by substantial evidence. ECF No. 14 at 1. Addressing Plaintiff's arguments for summary judgment, the Commissioner avers that: (1) substantial evidence supports the ALJ's credibility assessment of Plaintiff, (2) the ALJ sufficiently accounted for Plaintiff's concentration impairments in the RFC and (3) substantial evidence supports the ALJ's determination that Plaintiff is capable of working as a hospital food-service worker. Def.'s Br. Supp. Mot. Summ. J. 2–3, ECF No. 15. Accordingly, the Commissioner requests that the Court affirm the ALJ's decision. ECF No 15. at 1.

**B.    Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "'such relevant evidence as a reasonable mind might accept to support a conclusion.'" Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the United States Court of Appeals for the Fourth Circuit has stated that substantial evidence "consists of more than a mere

scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the ALJ['s]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

**C.   The ALJ's Decision is Supported by Substantial Evidence**

**1.   The ALJ Correctly Applied the Law and Her Credibility Assessment was Sufficiently Specific and is Not Patently Wrong**

Plaintiff argues that the ALJ "misstated and misapplied the law" when she improperly compared Plaintiff's statements and complaints "against the concept of 'debilitating functional limitations'" rather than weighing them "against the evidence of record as required by Social Security Ruling 16-3p."[2] ECF No. 11 at 1, 5.

Generally, there is a five-step process for evaluating whether a claimant is disabled within the meaning of the Social Security Act. See 20 C.F.R. § 404.1520(a). Here, Plaintiff takes issue with the ALJ's credibility assessment conducted during step five of that process. See id. § 404.1520(g). To determine whether a claimant has the residual functional capacity ("RFC") to perform other work, under step five, the ALJ is

---

[2] Plaintiff's reliance on Social Security Ruling 16-3p is misplaced. Because the ALJ issued her decision on November 9, 2015, R. 32, the ALJ was not bound by the Social Security's policy interpretation subsequently set forth in Ruling 16-3p—which became effective on March 28, 2016, see SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), corrected by SSR 16-3p, 2016 WL 1237954 (Mar. 24, 2016). Instead, the ALJ's credibility assessment was bound by Social Security Ruling 96-7p. See SSR 96-7p, 1996 WL 374186 (July 2, 1996), superseded by SSR 16-3p. Despite Plaintiff's mistaken reliance on Ruling 16-3p, Plaintiff is nevertheless correct that the ALJ must weigh Plaintiff's subjective claims against the evidence of record. Compare SSR 96-7p ("In determining the credibility of the individual's statements, the adjudicator must consider the entire case record . . . .") with SSR 16-3p ("Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments.").

bound by a two-step process. See Criss v. Comm'r of Soc. Sec., No. 5:16CV86, 2017 WL 2730647, at *3 (N.D. W. Va. June 26, 2017) (citing Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996)).

> First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record.

Id. (citations omitted).

The ALJ's "determination . . . must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p (emphasis added). Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively, 739 F.2d at 989–90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). "If the ALJ meets . . . her basic duty of explanation, then 'an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was "patently wrong."'" Criss, 2017 WL 2730647, at *3 (alteration in original) (emphasis added) (citations omitted).

Here, the ALJ correctly applied the law and properly considered all of the evidence of record when she assessed Plaintiff's credibility as fair, at best, and that assessment was sufficiently specific and is not patently wrong.

First, Plaintiff was not required to show that she suffered from a "debilitating functional limitation" to prove that she was disabled within the meaning of the Social Security Act. In her final decision, the ALJ diligently explained the five-step evaluation process for determining disability, including the applicable law. R. 19–21. There, the ALJ did not once state that Plaintiff was required to show, as a matter of law, that she was suffering from debilitating functional limitations in order to show that she was disabled. See id. Rather, the ALJ only used the phrases "debilitating functional limitation" and "to the extent one would expect" in her determination of Plaintiff's credibility because her subjective complaints that her functional limitations effectively left her debilitated were not supported by objective medical evidence. R. 25–30.

Although the ALJ noted that Plaintiff's "treatment records support diagnoses of osteoarthritis, tendonitis of the left rotator cuff, mild degenerative joint disease of the left hip, headaches, mild pulmonary restrictive disease, hypertensive cardiovascular disease, and obstructive sleep apnea," the ALJ concluded that "the evidence reflects that these conditions present no more than mild to moderate symptoms and limitations and do not preclude . . . the ability to perform a range of medium exertional work activities." R. 26. This conclusion was based, in part, on the ALJ's conclusion that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible . . . ." R. 26.

Specifically, Plaintiff testified that her physical limitations reduced her to "[m]ostly sitting around" all day. R. 56; see R. 23 ("At the hearing, the claimant testified that she mostly sits around during the day."). In other words, Plaintiff claimed that her physical limitations were debilitating (making her weak or feeble) because they forced her to sit

30

around most of the day. Id. It was based on this assertion that the ALJ explained why she thought Plaintiff's physical limitations were, in fact, not debilitating in nature. See R. 26–30. For example, in support of her credibility determination, the ALJ noted that Plaintiff "reported that she cares for her husband, children, and pets; has no difficulties with caring for her personal hygiene; prepares three meals a day; mows the lawn with a riding and a push mower; performs various household chores; drives a car; and gets outside 'all the time.'" R. 29 (quoting R. 218). Accordingly, the ALJ's use of the phrases "debilitating functional limitation," "debilitating in nature" and "to the extent one would expect" were not misstatements or misapplications of law but, rather, the product of Plaintiff's own subjective complaints. Because the ALJ's evaluation of Plaintiff's credibility did not require Plaintiff to show that she suffered from debilitating functional limitations, the ALJ correctly applied the law.

Second, the ALJ properly considered all of the evidence in the record when she assessed Plaintiff's credibility. In addition to considering evidence regarding Plaintiff's daily life and activities, the ALJ also considered a variety of medical evidence that appeared in legion. For example, the ALJ, addressing Plaintiff's musculoskeletal complaints, pointed to EMGs, nerve conduction studies, x-rays, and CT scans of Plaintiff's hands, arms, hips, knees, and shoulders that were completely normal or showed nothing more than a mild impairment. R. 26; see also 275 (normal left hand films), 350–51 (normal nerve conduction study and EMG showing no carpel tunnel syndrome, neuropathy or radiculopathy), 434 (doppler showing no right arm deep vein thombrosis), 445 (left shoulder MRI showing calcific tendinosis of the left rotator cuff but no acute abnormalities), 528–29 (normal EMG and nerve conduction study showing no

lower extremity neuropathy, myopathy or radiculopathy), 558 (mild left hip degenerative

joint disease), 559–60 (no significant abnormality of the knees including no significant

joint space narrowing or spurring).

Further, the ALJ noted that Plaintiff's physical exam findings showed that she

was "regularly assessed with 5/5 strength in her upper and lower extremities, a normal

gait, normal coordination, intact cranial nerves, intact sensations, and intact reflexes." R.

26; see also R. 449 (physical exam only noting tenderness in Plaintiff's abdomen), 527

(noting 5/5 motor strength, sensory examination intact, normal reflexes and gait), 529

(concluding that "[t]here is no electro physiologic evidence of neuropathy, myopathy or

radiculopathy in the lower extremities in this patient"), 530–31 (normal cranial nerves,

5/5 motor strength, clear chest, normal coordination, decreased pinprick in stocking

distribution and reflexes absent in ankles), 532 (normal cranial nerves, 5/5 motor

strength, clear chest and normal coordination), 534 (same), 536 (same), 543 (normal

cranial nerves, 5/5 motor strength, symmetrical reflexes, sensory intact, clear chest and

normal coordination), 548 (same), 586–88 (same). The ALJ also discussed the findings

Plaintiff's consultative exam. Wherein, Dr. Sabio concluded that Plaintiff did not have

significant upper or lower extremity limitations, only a slight decrease in the range of

motion of her knee and shoulder. R. 26; see also R. 402–403. Furthermore, the ALJ

considered Plaintiff's conservative treatment for her musculoskeletal complaints,

including physical therapy and injections that consistently resulted in physical

improvements. R. 26–27; see also R. 466 (reporting to Plaintiff's physical therapist that

she experienced good strength, no shoulder pain and was having no trouble sleeping or

housework), 585 (noting that Plaintiff's shoulder numbness, after injection, was "totally

resolved" and she was pain free and had a good range of motion). To date, Plaintiff's treatment has not required the use of a brace, splint, cane or, even, a wheelchair. R. 221.

In addition, the ALJ compared Plaintiff's complaints of dizziness and shortness of breath with the test results that showed effortless breathing at the consultative exam and controlled hypertension. R. 27–28; see also 533 (noting that dizziness seems to be improving), 276 (films showing clear lungs), 285 (reporting no asthma problems), 298 (normal cardiac study with no signs of myocardial ischemia), 299 (negative stress test), 373 (medical provider stating that Plaintiff's hypertension and COPD were "stable on meds"), 403 (consultative examiner finding "effortless" breathing), 443 (diagnostics showing clear lungs and no evidence of pulmonary edema or pneumothorax), 284 (exam showing regular heart rate and rhythm, even and unlabored respirations and lungs clear to auscultation), 295 (same), 303 (same), 474 (same), 485 (same), 503 (same). Nor is there any evidence that Plaintiff was hospitalized for any heart or respiratory exacerbations, despite Plaintiff's insistence on smoking, because her medical condition was controlled by her medications. R. 28.

Next, the ALJ considered Plaintiff's complaints of headaches and mental limitations. Regarding the headaches, the ALJ noted that the MRI and CT scans were normal and the medication relieved Plaintiff of her symptoms. R. 28; see also R. 278 (negative CT scan of head), 444 (same), 285 (reporting that her headaches were "much improved" and she was feeling "much better"), 370 (reporting that she was "doing well" and her medication was "controlling her headaches"), 533 (noting that headaches seem to be improving). Regarding her mental limitations, the ALJ discussed Plaintiff's lack of

33

treatment, daily activities and familial relationships. R. 29. Further, the ALJ noted that the consultative examiner, Dr. Morgan, found no severe mental deficiencies and the symptoms did not hinder Plaintiff's daily living activities.[3] R. 29; see also R. 397–98. Although not dispositive, Plaintiff, notably, has not submitted a single opinion from a treating physician that supports her allegations. See Thompson v. Halter, 45 F. App'x 146, 148 (3d Cir. 2002) ("[W]hile the absence of [a treating physician's statement of a disabling condition] is not dispositive of the issue of disability, it is surely probative of non-disability."). Based on the foregoing, the undersigned concludes that the ALJ properly considered all of the evidence of record when determining Plaintiff's credibility.

Third, after a careful of the ALJ's decision and the evidence of record, the undersigned further finds that the ALJ 's credibility assessment was sufficiently specific to make clear her reasoning in finding Plaintiff not entirely credible. Because the ALJ met her basic duty of explanation, the ALJ's credibility determination will only be reversed if it is patently wrong. See Criss, 2017 WL 2730647, at *3 (citations omitted). Here, Plaintiff fails to satisfy this high burden.

Accordingly, the court concludes that the ALJ's credibility assessment is supported by substantial evidence. See Perales, 402 U.S. at 401.

### 2. The ALJ Properly Accounted for Plaintiff's Mental Limitations When Determining Plaintiff's RFC

Next, Plaintiff argues that the ALJ did not account for Plaintiff's "function-by-function limitations associated with [her] concentration limitations" when the ALJ determined Plaintiff's RFC. ECF No. 11 at 12. In addition, Plaintiff claims that "[t]he ALJ

---

[3] For a more detailed discussion of the ALJ's analysis of Plaintiff's alleged mental limitations, see infra Section C.2.

did not carry from step 3 to step 4 [Plaintiff's] concentration limitations." Id. at 13. In support, Plaintiff directs the Court's attention to the United States Court of Appeals for the Fourth Circuit's holdings in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015) and Monroe v. Colvin, 826 F.3d 176 (4th Cir. 2016). Because the ALJ allegedly did not conduct the requisite function-by-function analysis, Plaintiff claims that Mascio and Monroe require us to remand the case to the ALJ.

"The process for assessing RFC is set out in Social Security Ruling 96-8p." Monroe v. Colvin, 826 F.3d 176, 187 (4th Cir. 2016) (citing Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015)); see also SSR 96-8p, 1996 WL 374184 (July 2, 1996). "Under that ruling, the assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." Monroe, 826 F.3d at 187 (internal quotations omitted) (citations omitted). The Fourth Circuit has not, however, adopted "a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." Mascio, 780 F.3d at 636; cf. Monroe, 826 F.3d at 188. Indeed, the salient point from the Fourth Circuit's decisions in Mascio and Monroe is "that 'remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Monroe, 826 F.3d at 188 (emphasis added) (quoting Mascio, 780 F.3d at 636). Accordingly, this Court must first determine whether the ALJ failed to assess Plaintiff's capacity to perform relevant functions. See id. If the ALJ failed to do so, the Court must then determine whether the ALJ's failure frustrates meaningful review because of contradictory evidence or other

inadequacies in the record. See id. Finally, if the ALJ's failure frustrates meaningful review, the Court must determine if remanding to the ALJ is appropriate under the circumstances. See id.

As a threshold matter, the Court notes that Plaintiff challenges the adequacy of the ALJ's RFC determination when Plaintiff's alleged disability is not based on a mental impairment. See R. 200. Rather, Plaintiff's alleged disability is a left bundle branch block and a heart condition. R. 200. In other words, Plaintiff takes issue with the limitations that the ALJ included in Plaintiff's RFC because the ALJ gave Plaintiff the benefit of the doubt regarding her mental limitations, limitations that do not form the basis of Plaintiff's alleged disability. With that said, the Court addresses the first two questions set forth above, which are dispositive.

First, the ALJ's decision properly addressed Plaintiff's mental limitations in the ALJ's function-by-function analysis. Although Ruling 96-8p requires the ALJ to conduct a "function-by-function analysis," the analysis it is referring to is an analysis of the claimant's physical, mental and other abilities. See SSR 96-8p (referring to "the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945"). Ruling 96-8p does not require the ALJ to do a function-by-function analysis of every physical or mental activity encompassed within said functions. See, e.g., 20 C.F.R. §§ 416.945(b), (c), (d) (using the phrase "such as" to introduce activities or impairments that may be relevant to the RFC determination). Even if it did, the ALJ's step-four analysis, albeit in the context of evaluating the severity of Plaintiff's alleged mental impairment,[4] addressed Plaintiff's mental impairment in the context of Plaintiff's (1) daily living; (2)

---

[4] Addressing one step of the five-step evaluation out of order is harmless error. See, e.g., Sanchez v. Comm'r Soc. Sec, 507 F. App'x 855, 859 (11th Cir. 2013); Martinez v. Astrue, 289 F. App'x 296, 299 (10th Cir. 2008).

social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. R. 23–24. In each context, the ALJ explained why Plaintiff's mental limitations were no more than mild or moderate given the evidence in the record. R. 23–24.

Specifically, the ALJ—giving Plaintiff the benefit of the doubt—concluded that Plaintiff suffers from mild restrictions in her daily life because of her mental impairment even though the State agency consultant found no limitations in Plaintiff's daily life and her "reported difficulties . . . [were] premised on physical complaints of pain, rather than due to a mental condition . . . ." R. 23.

Next, the ALJ concluded that Plaintiff's social functioning only suffers from moderate difficulties because Plaintiff "was assessed with moderately deficient social functioning and mildly slow speech" but was also assessed as "cooperative, compliant, [] with coherent and relevant speech." R. 23, 24. And despite her moderately deficient assessment, Plaintiff "is married and reports a good relationship with her husband and son. Moreover, she talks on the phone with friends, reported a history of getting along well with others, and shops in stores." R. 24 (citations omitted).

Further, in the context of concentration, persistence and pace, the ALJ concluded that Plaintiff experiences no more than moderate difficulties because although she "was assessed with moderately deficient recent recall, concentration, and pace[] and mildly deficient remote recall and persistence," Plaintiff "was assessed normal immediate recall" and "reported that she watches television, puts puzzles together, and reads . . . ." R. 24 (citations omitted). Also, Plaintiff "manages her finances[] and . . . drives a car." R. 24 (citations omitted).

Lastly, the ALJ noted that Plaintiff "has experienced no episodes of decompensation, which have been of extended duration." R. 24. And, "[t]here is no evidence of impatient hospitalization or other acute exacerbations of symptoms that would rise to the level of decompensation." R. 24.

To the extent Plaintiff challenges the sufficiency of the limitations set forth in the RFC, that argument is similarly unavailing. Plaintiff's mental limitations, including her concentration impairments, were adequately accommodated by her RFC. Specifically, the ALJ concluded that Plaintiff

> has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) (i.e. is able to occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; and stand and/or walk, with normal breaks, for a total of about 6 hours in an 8-hour workday), except [Plaintiff] can never climb ladders, ropes or scaffolds; can only occasionally balance and crawl; can frequently climb ramps or stairs, stoop, crouch, and kneel; must avoid concentrated exposure to extreme cold, extreme heat, excessive noise, and irritants (such as fumes, odors, dust, and gases), must avoid all exposure to hazards (such as unprotected heights and dangerous moving machinery); can only occasionally reach overhead, laterally, and behind with the left upper extremity; is limited to simple, routine, and repetitive tasks in a low stress job, defined as having only occasional changes in the work setting, and no strict production quotas, and is limited to occasional interaction with the general public, co-workers, and supervisors.

R. 25.

In <u>Mascio</u>, the Fourth Circuit noted "that an ALJ does not account 'for a claimant's limitation in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" <u>Mascio</u>, 780 F.3d at 638 (quoting <u>Winschel v. Comm'r Soc. Sec.</u>, 631 F.3d 1176, 1180 (11th Cir. 2011)). In addition to limiting Plaintiff "to simple, routine, and repetitive tasks in a low stress job,"

however, the ALJ's RFC determination, here, further limited Plaintiff to "occasional changes in the work setting, [] no strict production quotas, and . . . occasional interaction with the general public, co-workers, and supervisors." R. 25. The first limitation properly addresses Plaintiff's ability to perform simple tasks—whereas the latter limitations address Plaintiff's ability to stay on task. See Rayman v. Comm'r Soc. Sec., No. SAG-14-3102, 2015 WL 6870053, at *3 (D. Md. Nov. 6, 2015) ("While limitation to unskilled work alone is insufficient under Mascio, here the ALJ included other limitations that clearly account for [the plaintiff]'s moderate limitation in concentration, persistence, or pace."). For example, "the limitation to an environment with few changes and no production quotas assures that [Plaintiff] is not required to produce any particular volume of work-product and is not distracted or required to adapt to changes in the workplace." Id.; see also Baker v. Colvin, No. 3:15-CV-00637 (HEH), 2016 WL 3581859, at *3 (E.D. Va. June 7, 2016) ("Numerous district courts have held that an RPC limiting an individual to work in a non-production oriented environment properly addresses an individual's ability to stay on task." (collecting cases)).[5]

Second, to the extent the ALJ's decision does not explicitly explain how the limitations imposed in Plaintiff's RFC account for her mental limitations, the ALJ's failure does not frustrate meaningful review. For example, this case is not like Proctor v. Colvin, 229 F. Supp. 3d 494 (S.D. W. Va. 2017).

In Proctor, the United States District Court for the Southern District of West Virginia remanded a case to an ALJ because the ALJ failed to explain how the RFC limitations addressed the claimant's moderate difficulties in social functioning as well as

---

[5] Because Plaintiff does not challenge the legal sufficiency of the hypothetical questions posed to the vocational expert—like the plaintiff did in Mascio—the Court need not address it.

concentration, persistence or pace. 229 F. Supp. 3d at 499–500. Specifically, the ALJ limited the claimant "to sedentary work and that [the claimant] can only perform jobs that do not require reading or writing above a sixth grade level." Id. at 499. But "[t]he ALJ only concluded, without elaboration, that 'the [RFC] assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.'" Id. at 500 (second alteration in original). There, our sister court reasoned that "the ALJ did not explain his reasons for including a condition that [c]laimant cannot read or write anything above a sixth grade reading level and, in any event, this condition has no direct bearing on [c]laimant's ability to stay on task or interact in a socially appropriate manner with others." Id. Because the ALJ's decision did not include a limitation that clearly addressed the claimant's mental impairment or any related reasoning, the court concluded that it "lack[ed] the ability to meaningfully review the ALJ's decision. Id. (citing Mascio, 780 F.3d at 636–37).

Here, however, the ALJ's failure to explain how the limitations included in Plaintiff's RFC address her mental limitations, specifically, does not similarly frustrate meaningful review because those limitations logically address Plaintiff's mental impairment. For example, as discussed above, "the limitation to an environment with few changes and no production quotas assures that [Plaintiff] is not required to produce any particular volume of work-product and is not distracted or required to adapt to changes in the workplace." Rayman, 2015 WL 6870053, at *3. Notably, "[n]umerous district courts have held that an [RFC] limiting an individual to work in a non-production oriented environment properly addresses an individual's ability to stay on task." Baker, 2016 WL 3581859, at *3 (collecting cases). But see Scruggs v. Colvin, 2015 WL

2250890, at *6 (W.D.N.C. May 13, 2015) (remanding the case to the ALJ because

limiting an individual to a non-production environment did not address an individual's

ability to stay on task). Because the reason for including these limitations is apparent

from the limitations themselves, this Court's meaningful review of Plaintiff's RFC

determination is not frustrated. Accordingly, the ALJ's error, if any, is harmless.

Third, Plaintiff's argument that the ALJ did not carry Plaintiff's concentration

limitations from step three to step four is plainly without merit; the ALJ's decision

dedicates no less than a page and a half to analyzing Plaintiff's mental limitations in the

ALJ's step four analysis. R. 23–25.

### 3. The Commissioner Met Her Burden of Proving that Other Work Exists that Plaintiff is Capable of Performing

Lastly, Plaintiff avers that the Commissioner has not met her burden, at step five,

to show that other jobs exist in the national economy that Plaintiff is capable of

performing because the jobs identified by the vocational expert "were either 'light' in

nature or exposed [Plaintiff] to extreme heat . . . ." ECF No. 11 at 13.

During step five, the Commissioner has the burden "to prove that the claimant,

despite her impairments," Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005), "is

able to perform work available in the national economy," Bowen v. Yuckert, 482 U.S.

137, 146 n.5 (1987); see also Ecklund v. Berryhill, No. 0:16-872-BHH-PJG, 2017 WL

3405654, at *1 (D.S.C. July 25, 2017) ("[t]he Commissioner must establish that the

claimant has the residual functional capacity, considering the claimant's age, education,

work experience, and impairments, to perform alternative jobs that exist in the national

economy." (citations omitted)). "The Commissioner may carry this burden by obtaining

testimony from a vocational expert." Ecklund, 2017 WL 3405654, at *1 (citing Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983)).

Here, the Commissioner met her step-five burden of showing that Plaintiff is capable of performing other work because the ALJ concluded that Plaintiff is capable of performing "medium work,"[6] R. 25–30, and the independent vocational expert testified that Plaintiff could perform medium work as a hospital food-service worker, R. 60–63. Plaintiff argues that working as hospital food-service worker would violate the ALJ's RFC because it would expose her to concentrated amounts of extreme heat. ECF No. 11 at 14–15. This argument is unavailing.

Based on the descriptions set forth in the Dictionary of Occupational Titles ("DOT"), working as a hospital food-service worker[7] would only expose Plaintiff to extreme heat for up to one third of the work day (i.e., up to three hours). U.S. Department of Labor, Dictionary of Occupational Titles,1991 WL 672771 (4th ed. 1991) (food-service worker, hospital 319.677-014). Indeed, the DOT notes that working as a

---

[6] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

[7] The DOT describes working as a hospital food-service worker as follows:

> Prepares and delivers food trays to hospital patients, performing any combination of following duties on tray line: Reads production orders on color-coded menu cards on trays to determine items to place on trays. Places items, such as eating utensils, napkins, and condiments on trays. Prepares food items, such as sandwiches, salads, soups, and beverages. Places servings in blender to make foods for soft or liquid diets. Apportions and places food servings on plates and trays according to diet list on menu card. Examines filled tray for completeness and places on cart, dumbwaiter, or conveyor belt. Pushes carts to halls or ward kitchen. Serves trays to patients. Collects and stacks dirty dishes on cart and returns cart to kitchen. Washes dishes and cleans work area, tables, cabinets, and ovens. Collects and places garbage and trash in designated containers. May record amount and types of special food items served to patients. May assemble and serve food items to hospital staff in cafeteria.

U.S. Department of Labor, Dictionary of Occupational Titles,1991 WL 672771 (4th ed. 1991) (food-service worker, hospital 319.677-014).

hospital food-service worker would only "occasionally" expose you to "extreme heat." Id.

("Extreme Heat: Occasionally - Exists up to 1/3 of the time"). The term "'[o]ccasionally'

means occurring from very little up to one-third of the time" (i.e., up to three hours of a

eight hour work day). SSR 83-10, 1983 WL 31251 (1983). In addition, the term

"'[f]requent' means occurring from one-third to two-thirds of the time" (i.e., from three to

six hours of an eight hour work day). Id. Based on the definitions of "occasional" and

"frequent," the Court concludes that "concentrated exposure"—although undefined—

means something more than "occasional" or "frequent" exposure. This conclusion is

supported by the job description for the hospital food-service worker set forth in the

DOT. See supra note 7. Further, it is consistent with the definition of the root word

"concentrate," which is defined as "to increase in strength, density, or intensity."

Webster's New World, College Dictionary 307 (5th ed. 2014). Accordingly, the Court

concludes that "concentrated exposure to extreme heat" means being exposed to

extreme heat for more than three hours, if not more. Because working as a hospital

food-service worker would only occasionally expose Plaintiff to extreme heat, Plaintiff is

capable of performing the "other job" proposed by the vocational expert despite the

limitations set forth in Plaintiff's RFC.

Further, because Plaintiff is capable of performing medium work as a hospital

food-service worker, the Court need not address whether the three other jobs proposed

by the vocational expert are sufficient.[8] See ECF No. 11 at 14–15. It is well settled that

---

[8] Because the ALJ concluded that Plaintiff is capable of performing medium work, the Court need not address Plaintiff's argument that the Medical-Vocational Guidelines do not require her to perform light work, given her advanced age. Nor must the Court address the ALJ's failure to consider Plaintiff's change in age from fifty-three years old at the time of the alleged onset of disability (closely approaching advanced age) to fifty-six years old at the time of the administrative hearing and the ALJ's decision. See Ash v. Colvin, No. 2:13–CV–47, 2014 WL 1806771, at *6–10 (N.D. W. Va. May 7, 2014); see also 20 C.F.R. §§ 404.1563(d), (e).

the "identification of even <u>one</u> occupation appropriate for [Plaintiff] fulfills the Commissioner's burden at the fifth step of the process . . . ." <u>Kennerly v. Colvin</u>, No. 2:15–cv–01540, 2015 WL 9672913, at *13 (S.D. W. Va. Dec. 8, 2015) (emphasis added) (citing 20 C.F.R. §§ 404.1566, 416.966 ("[W]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which the [claimant] is able to meet with [her] physical or mental abilities and vocational qualifications.")); <u>see also</u> <u>Young v. Colvin</u>, No. 13–CV–4551 WFK, 2015 WL 2219000, at *6 (E.D.N.Y. May 11, 2015) ("[E]ven if the [vocational expert] had identified only <u>one</u> job that existed in sufficient numbers, the Commissioner would have met his burden at the fifth step." (emphasis added) (citation omitted)).

But the existence of a job, alone, is not dispositive; the Commissioner must also show that the job exists in <u>significant</u> numbers. <u>See</u> <u>Kennerly</u>, 2015 WL 9672913, at *13 (noting that identifying one occupation is sufficient at step five "so long as the occupation is available in significant numbers in the economy"); <u>see also</u> <u>Farnsworth v. Astrue</u>, 604 F.Supp.2d 828, 859 (N.D. W. Va. 2009) (explaining that the issue at step five is "whether there is at least one suitable occupation representing a significant number of jobs in the economy"); <u>Rios v. Colvin</u>, No. 1:13–CV–1458, 2015 WL

---

The ALJ is only required to consider which age will apply to the Medical-Vocational Guidelines if a borderline age situation exists. <u>See</u> <u>Ash</u>, 2014 WL 1806771, at *6–10. There is a two-part test to determine whether a borderline age situation exists: "(1) determine whether the claimant's age is within a few days to a few months of a higher age category; (2) if so, determine whether using the higher age category would result in a decision of 'disabled' instead of 'not disabled.'" <u>Id.</u> at *6 (quoting HALLEX II-5-3-2 (S.S.A.). "If the anser [sic] to one or both is 'no,' a borderline age situation either does not exist or would not affect the outcome." <u>Id.</u> (quoting same). Because the ALJ concluded that Plaintiff was capable of performing medium work, R. 25–30, Plaintiff's change in age from fifty-three to fifty-six did not affect the outcome of her disability determination, <u>see</u> 20 C.F.R. Part 404, Subpart P, Appendix 2, Rules 203.14, 203.21. When a claimant (1) has a high school education, (2) has no previous work experience or that work experience was unskilled and (3) is capable of performing medium work, the claimant is <u>not</u> disabled regardless of whether he or she is "closely approaching advanced age" (fifty to fifty-four) or is of "advanced age" (fifty-five and over). <u>See</u> 20 C.F.R. Part 404, Subpart P, Appendix 2, Rules 203.14, 203.21.

1258908, at *14 (E.D. Va. Mar. 18, 2015) (holding that "[t]he fact that the vocational expert identified only one job is not by itself determinative of this issue"). Although the Fourth Circuit has not yet "clearly established the minimum number of jobs necessary to constitute a 'significant number,'" some circuits "have found that a minimal number of jobs, including from one occupation, constitute a significant number at step five." Rios, 2015 WL 1258908, at *14 (citations omitted); see also Hall v. Bowen, 837 F.2d 272, 275 (6th Cir. 1988) (finding 1,350 jobs in the local economy significant); Martinez v. Heckler, 807 F.2d 771, 775 (9th Cir. 1986) (upholding the ALJ's finding that 3,750 to 4,250 jobs were significant in number); Farnsworth v. Astrue, 604 F. Supp. 2d 828, 859 (N.D. W. Va. 2009) (concluding that 223,000 jobs in the national economy and 1,150 jobs in the regional economy were "significant"). Here, the vocational expert testified that there are 225,000 jobs in the national economy as a hospital food-service worker and 2,000 jobs in the regional economy of West Virginia, Maryland, Ohio and Pennsylvania. R. 60, 62. Accordingly, the Commissioner satisfied her burden of demonstrating that there are a significant number of jobs that exist in the national and regional economy that Plaintiff can perform. See Farnsworth, 604 F. Supp. 2d at 859; Kennerly, 2015 WL 9672913, at *13.

## VII.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's claim for DIB is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment [ECF No. 10] be **DENIED**, Defendant's Motion for Summary Judgment [ECF No. 14] be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

45

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. See 28 U.S.C. § 636(b)(1); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); see also Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 24th day of August, 2017.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE